# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>　　　　　　　　　　　　　　　　)<br>　　　　　　Plaintiff, 　　　　　　　)<br>　　　　　　　　　　　　　　　　)<br>-vs-　　　　　　　　　　　　　　 )　　Case No. CR-24-311-F<br>　　　　　　　　　　　　　　　　)<br>BREON MONTE BELLAMY,　　　 )<br>　　　　　　　　　　　　　　　　)<br>　　　　　　Defendant.　　　　　　)| |

### ORDER re: JAMES HEARING AND RULE 801(d)(2)(E) ISSUES

**I.　　Introduction.**

　　We often teach–or at least try to teach–small children that "sharing is caring." Joanie Wilson, Reecy Bench, Jacee Bench and the late Mika Wilson were all members of a drug-ridden extended family living in or near Loco, Oklahoma. For them, plus the defendant, Breon Bellamy, sharing was caring. What was shared was money, information, logistical support (transportation), access to fentanyl and, above all, fentanyl itself. The end result, the government says, was the death of Mika Wilson from ingestion of a fatal dose of fentanyl. The "sharing is caring" concept fits because most of the players in this conspiracy were not in it for the usual crass, profit-oriented reasons. The understanding that these co-conspirators did not all have to be in it for the purpose of personal financial profit goes far to support the proposition that they could be, and were, co-conspirators in the sense contemplated by Fed.R.Evid. 801(d)(2)(E) and the relevant federal drug laws.

　　The defendant, Breon Monte Bellamy, is charged in Count 1 with distribution of fentanyl resulting in death, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). He is charged in Count 2 with drug conspiracy resulting in death, in

violation of 21 U.S.C. § 841(b)(1)(C).  The conspiracy count entitled the defendant to what is commonly called a James hearing, United States v. James, 590 F.2d 575 (5th Cir. 1979).  That hearing was held on October 31, 2024.  With the benefit of the hearing and the parties' post-hearing briefs, the matter is ripe for a determination of the extent to which the statements of alleged co-conspirators are admissible under Rule 801(d)(2)(E).

## II. The legal framework for determination of the admissibility of co-conspirator statements.

Under Rule 801(d)(2)(E), co-conspirators' statements that would otherwise be inadmissible hearsay may be introduced into evidence against a defendant co-conspirator if they were made "during and in furtherance of the conspiracy." United States v. Morgan, 748 F.3d 1024, 1036 (10th Cir. 2014) *cert. denied sub nom.* Ford v. U.S., 135 S.Ct. 298 (2014).  Before admitting a co-conspirator's statement, the court must determine, by a preponderance of the evidence, (1) that a conspiracy existed, (2) that the declarant and the defendant were both members of the conspiracy, and (3) that the statement was made in the course of and in furtherance of the conspiracy.  *Id.  See also*, United States v. Owens, 70 F.3d 1118, 1123 (10th Cir. 1995), *cert. denied*, 525 U.S. 883 (1998).

The prerequisites for the existence of a drug conspiracy are:  (1) an agreement by two or more persons to violate the law, (2) knowledge of the objectives of the conspiracy, (3) knowing and voluntary involvement in the conspiracy and (4) interdependence among co-conspirators.  United States v. Tennison, 13 F.4th 1049, 1059 (10th Cir. 2021).  In the context of this case, it is noteworthy that conspiracy law does not require proof that generation of financial profit, in the usual sense, was an objective of the conspiracy, or that every player had exactly the same motive.  It is enough that some or all of the joint actors participated in the joint activity for the purpose of getting drugs to satisfy their own drug cravings, to help others get the

drugs, or to make a profit or reap some other personal benefit. The players need not know all of the details or all of the members of the conspiracy. *Id.* A participant's participation in the joint activity may be slight, such as telling a "one-time lie" for the purpose of furthering the objectives of the conspiracy. *Id.* at 1059-60.[1]

It is not necessary to dwell on this point, but Bellamy goes a step too far in suggesting, for James hearing purposes, that "the Court should determine whether any conspiracy is within the full scope of the charged drug conspiracy or whether the evidence, at most, establishes that a different or smaller conspiracy exists, the evidence of which would be highly material in determining the admission of co-conspirator statements." Doc. no. 31, at 4. What is relevant for purposes of determining admissibility under Rule 801(d)(2)(E) is whether the actors who made the statements the government wants to introduce into evidence were acting jointly. "[T]hese rules [Fed.R.Evid. 104 and 801(d)(2)(E)] apply even where a conspiracy or concerted action is not formally charged but is proven at trial." United States v. Alfonso, 738 F.2d 369, at 371 (10th Cir. 1984). *See also*, United States v. Durland, 575 F.2d 1306, 1308 (10th Cir. 1978) (Rule 801(d)(2)(E) "is applicable so as to admit statements of co-conspirators, where it appears from the evidence that they

---

[1] Bellamy does not, in terms, invoke the "buyer-seller" rule to defeat the existence of a drug conspiracy–and for good reason. The buyer-seller rule does not apply where "the buyer shares the conspiracy's objective." Tennison, 13 F.4th at 1060. The sequence of relevant transfers started with 200 pills. The only transfer of a quantity small enough even to support application of the buyer-seller rule (*see, id.*) was the final transfer to Mika Wilson. But, as will be seen, Wilson's participation in the joint activities was not limited to his receipt of the final (fatal) transfer. He shared the conspiracy's objective. (Bellamy does refer briefly to the buyer-seller rule in discussing whether Jacee Bench was a member of the conspiracy. Doc. no. 43, at 2. But the court's findings in this order do not tie Jacee Bench into the conspiracy on the basis of any purchase or sale. The government has no evidence of a transaction between Bellamy and Jacee. James hearing transcript, doc. no. 40 ("Tr."), at 31. Bellamy was wary of dealing with Jacee because of her young age. *Id.* at 31, 43. Instead, she was, as will be seen, a willing conduit for information Bellamy needed in order to accomplish his objectives as a co-conspirator.)

3

were acting in concert, even though the conspiracy is not in accordance with the charge of conspiracy or even though a conspiracy has not been charged.")

In determining whether the prerequisites for admissibility under Rule 801(d)(2)(E) have been satisfied, the court may consider the co-conspirator's statements that are sought to be admitted. Bourjaily v. United States, 483 U.S. 171, 181 (1987); United States v. Lopez-Gutierrez, 83 F.3d 1235, 1242 (10th Cir. 1996); Owens, 70 F.3d at 1125. Under Bourjaily, there need, at most, be "some independent evidence linking the defendant to the conspiracy." United States v. Martinez, 825 F.2d 1451, 1453 (10th Cir. 1987), *cert. denied*, 494 U.S. 1059 (1990). That "independent evidence may be sufficient even when it is not 'substantial.'" Lopez-Gutierrez, 83 F.3d at 1242. "Independent evidence," in this context, is not rendered inadmissible by the fact that it comes from some other member of the conspiracy or by the fact that the statement was made to a government agent. Owens, 70 F.3d at 1125. To the contrary, "independent evidence" is simply "evidence other than the proffered [co-conspirator] statements themselves." *Id.*

In determining whether the government has carried its burden under Rule 801(d)(2)(E), the court has the discretion to consider any evidence not subject to a privilege, regardless of whether that evidence would be admissible at trial. Owens at 1124.

A statement made by a co-conspirator is admissible against a defendant who subsequently joins the conspiracy. United States v. Brown, 943 F.2d 1246, 1255 (10th Cir. 1991). Thus, the fact that a defendant may have joined the conspiracy after its inception does not make his co-conspirators' previous statements inadmissible. *Id. See also*, United States v. Dial, 757 F.2d 163, at 170-71 (7th Cir. 1985), *cert. denied*, 474 U.S. 838 (1985).

### III. Factual background and analysis of Rule 801(d)(2)(E) issues.

The court's factual findings are based in part on the declarants' statements themselves, and in part on the testimony of Girard Capps, a narcotics investigator with the Lawton police department. As might be expected, Mr. Capps' investigation disclosed a considerable amount of information beyond the matters evidenced by the statements (Facebook messages) that are in evidence. Issues as to when to take the next step and how to raise the money necessary to buy enough fentanyl to get favorable pricing accounted for much of the Facebook messaging. As defense counsel put it, with the concurrence of Mr. Capps: "[I]t takes a few days for everybody to get enough money together to meet up." Tr. at 20.

Bellamy's contentions as to the existence of the conspiracy, and as to which individuals were in it, require the court to look at who said and did what, and when, bearing in mind that Bellamy's opposition to admissibility under Rule 801(d)(2)(E) centers on his contention that Jacee Bench, Joanie Wilson and Mika Wilson were not members of the charged conspiracy. Doc. no. 43, at 2-5.

As an initial matter, the path of the fentanyl pills that included the fatal dose should be borne in mind. The sequence begins with Bellamy supplying 200 pills to Reecy Bench. Of those, 100 pills went to an individual identified only as "Jarryd." Jarryd then supplied about 80 pills to Joanie Wilson (Reecy Bench's mother). From Joanie's[2] supply, "several pills" went back to Reecy Bench, who then supplied the fatal dose to Mika Wilson (nephew of Joanie Wilson) in the early morning hours of August 23, 2023. Doc. no. 38, at 3-4 (government's proffer); Tr., at 9 (Capps adopting as his testimony the detailed factual summary in the proffer).

---

[2] For the sake of brevity and to avoid confusion, some of the related family members are referred to in this order by their first names.

Jacee Bench as a co-conspirator

Jacee Bench, the minor daughter of Joanie Wilson, served when necessary as a conduit for information between Reecy Bench (Jacee's older sister) and Bellamy. Jacee's assistance in that capacity was needed at least some of the time because Bellamy had blocked Reecy on Facebook.  Tr. 17.  Jacee was also willing to supply her mother (Joanie) and sister (Reecy) when they ran low:  "We're literally not gonna have shit today and the only couple we'll have jacee is gonna fucking get."  Message Reecy to Joanie, doc. no. 38-7, at 2.[3]

Joanie Wilson as a co-conspirator

Joanie Wilson, "as the mother of this family, she was normally the one who would control the money, get the money together from different individuals, whether it be family or other people that they distributed to, and hold on to that until the transaction happened. She would then take the majority of the fentanyl tablets and distribute them from there."  Tr. at 16-17 (Capps).  Her central role is shown by an August 18, 2023 message to her from her daughter, Reecy Bench:  "Bre [Breon Bellamy] texted.. 100 for 300 u could literally get a whole pck off jarryd money."  Doc. no. 38-7, at 2.   Joanie Wilson was also, as noted, the intermediary between Jarryd and Reecy for the supply that included the fatal dose that Reecy supplied to Mika Wilson.

Mika Wilson as a co-conspirator

It is tempting to think of Mika Wilson as a victim and not as a co-conspirator. After all, he consumed the fatal dose that was supplied, in turn, by Bellamy, Reecy Bench, Jarryd, Joanie Wilson and (again) Reecy Bench.  But that is not the whole story.  The family "was without a vehicle other than Mika's," so he gave them rides, for instance giving "Reecy, Jacee or Joanie a ride to Lawton to buy fentanyl."  Tr.

---

[3] Whether that actually resulted in Jacee supplying Joanie and Reecy is unclear (and irrelevant). *See*, doc. no. 38-7, at 3 (message at 11:25 a.m. on Aug. 19, 2023 from Reecy to Joanie).

17. Thus, early in the relevant period, Reecy Bench messaged Mika Wilson that: "Mom [Joanie Wilson] asked if u could take her to Lawton with gas money and blues and stuff." Doc. no. 38-7, at 1. Transportation to move fentanyl and money was essential. Mika Wilson's logistical support was easily enough to put him in the conspiracy. *Cf.* Tennison, 13 F.4th at 1060 (a single lie is enough). Thus, Mika Wilson was not a mere customer at the end of a chain of distribution with which he did not otherwise have a connection. He was a knowing participant, rendering assistance to his co-conspirators, in the fentanyl distribution conspiracy that facilitated his fatal overdose.

Bellamy and Reecy Wilson as co-conspirators

Bellamy advances no developed argument to take himself or Reecy Wilson out of the conspiracy. But lest it be thought that the court has overlooked them, the court finds that they were key players in the fentanyl distribution conspiracy charged in the indictment. The chain of events that began with Bellamy's sale of 200 pills and ended with the fatal dose consumed by Mika Wilson got started with communications between Reecy Bench and Bellamy on August 15, 2023. Reecy then went (with her mother) to the Comanche Nation Casino in Lawton to conduct that original transaction. As discussed above, Reecy off-loaded a batch of pills, including the fatal ones, to her mother and then got them back from her mother, with the result that the fatal pills, once again in Reecy's possession, moved from Reecy to Mika Wilson.

Reecy was a willing coordinator as when (as noted above) she messaged Mika Wilson: "Mom asked if u could take her to Lawton with gas money and blues and stuff." Doc no. 38-7, at 1. Two days later (again to Mika Wilson): "Hey if to my or u isn't busy would y'all wNna give us a ride to Lawton for gas and some blues." *Id.*

7

For his part, Bellamy was not just a source of pills. He was a guiding influence, not just selling but patiently working with the other players to help them get what they wanted while doing his best to avoid ending up on the short end of a transaction.

Common purpose

Among the five co-conspirators, there were certainly variations in terms of roles, depth of involvement and motivation for involvement. But they shared a common purpose, *viz*.: to obtain, share and otherwise distribute fentanyl. In the service of that common purpose, they cooperated to raise money when and how they could, to share necessary information (such as information about prices), and to arrange the logistics necessary to get the pills, to pay for them, and to distribute them.

Furtherance of the conspiracy

The foregoing discussion makes clear that the court has found that the charged conspiracy did exist. The players were Bellamy, Joanie Wilson, Reecy Bench, Jacee Bench and Mika Wilson. The conspiracy had its inception before the first of the statements the government desires to introduce and lasted at least until the fatal dose was delivered to Mika Wilson.

It doesn't take much for a statement to be made in furtherance of the objectives of a conspiracy, but the statement must have some discernible connection with the attainment of the objectives of the conspiracy. That can include statements indicating preparation, planning, coordination, transacting, avoiding detection, recruiting, reassuring other members, sharing relevant information, and keeping others abreast of activities undertaken in pursuit of the objectives of the conspiracy. The court has carefully reviewed the proffered statements (doc. no. 38-7). The court is satisfied that all but two of the proffered statements were made during and in furtherance of the charged conspiracy. The two outliers are:

August 17, 2023, Mika Wilson to Reecy Bench: "I was sleeping and Tony just got home lol."

August 23, 2023, Reecy Bench to Mika Wilson: "I think I might try to ride pystins new 4 wheeler into Loco lol and then I'll drive it to ur house and hangout."

The court does not readily discern how the "in furtherance" requirement is satisfied by these two statements. If, at trial, the government can make the required showing as to these two statements, they too will be admitted.

## Conclusion

The court previously granted defendant's motion for a James hearing. Doc. no. 32. That hearing has now been held and the court, with the benefit of that hearing and the parties' written submissions, has concluded that, with the exceptions set forth above, the government has carried its burden as that burden is articulated in the authorities discussed in part II, above.

DATED this 11th day of December, 2024.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

24-0311p009 JAMES HEARING .docx